**LITE DEPALMA GREENBERG & AFANADOR, LLC**
Joseph J. DePalma
Catherine B. Derenze
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com
cderenze@litedepalma.com

*Attorneys for Plaintiffs and the Proposed Class and Subclass*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| GWENDOLYN ANDERSON, DENNIS CANETTY and ANGELICA LUNA, Individually and On Behalf of All Others Similarly Situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>QUEST DIAGNOSTICS INCORPORATED,<br><br>*Defendant*. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs Gwendolyn Anderson, Dennis Canetty, and Angelica Luna ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint against Quest Diagnostics Incorporated ("Quest" or "Defendant"). Plaintiffs allege facts concerning their own experiences on personal

knowledge and all other matters on information and belief based on counsel's investigation, including Quest's public disclosures. Plaintiffs allege as follows:

## NATURE OF THE ACTION

1. This action arises from unauthorized access to Quest's Quanum Lab Services Manager system ("Quanum LSM"), which Quest discovered on October 21, 2026 and publicly disclosed on October 22, 2026 (the "Data Breach"). Plaintiffs seek relief for Quest's alleged failure to use reasonable safeguards to protect the personally identifiable information ("PII") and protected health information ("PHI") entrusted to it in connection with laboratory testing (collectively, "Private Information").

2. Quest is among the largest clinical laboratory and diagnostic information services companies globally, serving approximately one-third of adult Americans and roughly half of all physicians and hospitals in the United States each year, and operating more than 7,700 patient access points in North America, including approximately 2,000 patient service centers. Quest's Quanum Lab Services Manager ("Quanum LSM") platform is an online system that physicians, hospital personnel, and medical office staff use to manage laboratory services, order lab tests online, access test results, track order status, and order supplies. In order for Quest to provide these services, it receives, processes, and stores patients' PII and PHI, including that of Plaintiffs and the other Class Members. Plaintiffs were

Quest's clients and utilized Quest's services, either directly or through a healthcare provider.

3. Quest collected, used, and derived a benefit from Plaintiffs' and Class Members' PII and PHI, yet breached its duties by failing to implement or maintain adequate security practices to protect that information.

4. As a healthcare provider that transmits health information electronically, Quest is a covered entity under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and owed a duty to Plaintiffs and Class Members under state and federal law, as well as under common law and applicable industry standards, to protect the Private Information it obtained from Plaintiffs and Class Members from unauthorized access and disclosure by implementing and maintaining reasonable and adequate security measures.

5. Quest's public disclosures acknowledge that personal information and patient records were affected. The full scope remains under investigation, including the identities of affected patients and the particular information involved. Plaintiffs allege on information and belief that their identifying information and confidential laboratory records were among the records accessed.

6. Quanum LSM enables healthcare professionals to order tests and retrieve patient results. Unauthorized access to identifiable laboratory records intrudes into patients' private medical affairs. Plaintiffs entrusted that information

to Quest for testing and related authorized purposes, not for disclosure to an outside intruder.

7. This Data Breach was entirely foreseeable. Quest has a well-documented history of data security failures, including two data breach incidents within the past ten years and a 2021 ransomware attack suffered by one of Quest's subsidiaries. Despite this history, and despite the well-known and escalating threat of cyberattacks targeting the healthcare sector, Quest failed to implement adequate measures to safeguard Plaintiffs' and Class Members' Private Information.

8. Plaintiffs and Class Members had no control over how Quest secured their Private Information. Because Quest's systems are typically utilized by healthcare providers, some patients never access Quest's systems directly. Thus, when patients entrusted Quest with their Private Information, they reasonably relied on Quest to keep their sensitive Private Information confidential and securely maintained, to use it for business purposes only, and to make only authorized disclosures of such sensitive data.

9. Plaintiffs allege that the unauthorized access deprived them of the confidentiality and control of their medical information. That alleged loss of confidentiality occurred when their records were accessed without authorization.

10. Plaintiffs also allege anxiety and distress arising from that loss of confidentiality and a substantial risk of future misuse. Sensitive medical information

and persistent personal identifiers can facilitate targeted deception, financial fraud, and medical identity theft.

11. Plaintiffs anticipate continuing efforts to protect against misuse of their information. The nature and extent of any recoverable mitigation expenses will depend on the information compromised and the reasonable protective measures required. Plaintiffs' individual injuries are described below.

12. Quest possessed substantial resources to safeguard its patients' Private Information, reporting approximately $11 billion in annual revenue, serving nearly half of all physicians and hospitals nationwide, and operating thousands of patient service centers.[1] Nonetheless, Quest failed to implement adequate access controls, monitoring systems, and data-minimization measures consistent with federal law, its own privacy commitments, and industry standards.

13. Quest controlled the security of the affected platform. Patients could not configure its access restrictions, examine its logs, or prevent an unauthorized person from accessing records held by Quest. Reasonable safeguards were therefore necessary to protect the confidentiality of the information patients supplied for laboratory services.

14. Quest's general public notice does not identify the particular records

---

[1] *See* Steve Alder, *Patient Data Likely Accessed in Quest Diagnostics Hack*, HIPAA Journal (Oct. 23, 2026), https://www.hipaajournal.com/quest-diagnostics-data-breach-2026/.

affected for each Plaintiff. That uncertainty compounds Plaintiffs' concerns about the exposure of their confidential information and the steps appropriate to protect against misuse.

15. Plaintiffs bring this action on behalf of themselves and all persons whose Private Information was exposed as a result of the Data Breach and assert claims for negligence, breach of implied contract, breach of confidence, breach of the implied covenant of good faith and fair dealing, unjust enrichment, breach of fiduciary duty, declaratory and injunctive relief, and violations of New York General Business Law § 349, and seek monetary damages, punitive damages, declaratory relief, injunctive relief, equitable relief, reasonable attorneys' fees, costs, and expenses incurred in bringing this action, and all other relief authorized by law.

## THE PARTIES

16. Plaintiff Gwendolyn Anderson is an adult resident and citizen of Texas. She received laboratory services from Quest and alleges on information and belief that her Private Information was accessed in the Data Breach, as described below.

17. Plaintiff Dennis Canetty is an adult resident and citizen of New York. He received laboratory services from Quest and alleges on information and belief that his Private Information was accessed in the Data Breach, as described below.

18. Plaintiff Angelica Luna is an adult resident and citizen of Texas. She received laboratory services from Quest and alleges on information and belief that

her Private Information was accessed in the Data Breach, as described below.

19. Defendant Quest Diagnostics Incorporated ("Quest") is a Delaware corporation with its principal place of business at 500 Plaza Drive, Secaucus, New Jersey 07094. Quest is a clinical laboratory and diagnostic information services company and, as a healthcare provider that transmits health information electronically, a covered entity under HIPAA.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), (5)(B), and (6). Plaintiffs are citizens of Texas and New York; Quest is incorporated in Delaware and maintains its principal place of business in New Jersey. On information and belief, the proposed Class includes at least 100 persons and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. Those allegations are based on Quest's nationwide operations, Quanum LSM's use for patient orders and results, Quest's acknowledgment that patient records were affected, and the aggregate relief sought. The precise number of affected patients and scope of their losses will be determined through Quest's records and discovery. Plaintiffs do not assert a private federal cause of action under HIPAA or the FTC Act.

21. This Court has general personal jurisdiction over Quest because its principal place of business is in New Jersey and it is at home in this State.

22. Venue is proper under 28 U.S.C. § 1391(b)(1) and (c)(2) because Quest resides in this District. On information and belief, decisions concerning the governance and security of Quest's systems and its response to the Data Breach also emanated from its headquarters in this District.

## FACTUAL ALLEGATIONS

### A. Quest Collects and Profits from Plaintiffs' and Class Members' Sensitive Private Information

23. Quest is among the largest clinical laboratories globally. Each year, Quest serves approximately one-third of adult Americans and roughly half of all physicians and hospitals in the United States, and it operates more than 7,700 patient access points in North America, including approximately 2,000 patient service centers.[2]

24. Quest offers a wide array of services ranging from routine blood work to specialized areas, including oncology, infectious disease, genetics, and neurology, to patients like Plaintiffs and Class Members.

25. In the course of providing its clients with products and services, Quest necessarily receives the patients' PII directly from patients or from the providers who order tests on their behalf. Without receiving patient Private Information, Quest could not perform tests, report results, or obtain payment from insurers and patients.

---

[2] *Fact Sheet*, Quest Diagnostics, https://newsroom.questdiagnostics.com/Fact-sheet (last visited Nov. 4, 2026).

26. Upon information and belief, such highly sensitive and confidential PII includes patients' full names, addresses, phone numbers, email addresses, dates of birth, Social Security numbers, sex, health insurance information and member identifiers, and payment and billing information.

27. In addition, in the course of providing its clients with products and services specific to lab tests and ordering test results, Quest necessarily receives the patients' PHI directly from patients or from the providers who order tests on their behalf. Without receiving patient Private Information, Quest could not perform tests, report results, or obtain payment from insurers and patients.

28. Upon information and belief, such highly sensitive and confidential PHI includes the patients' healthcare provider information, test orders, diagnosis and procedure codes, specimen and accession data, and laboratory results.

29. This type of Private Information, consisting of the patients' PII and PHI, is extremely sensitive and extremely valuable to criminals because it can be used to commit serious identity and medical identity theft crimes.

30. Quest's HIPAA Notice of Privacy Practices describes its responsibility to protect patient health information, follow its stated privacy practices, and notify affected individuals of a breach involving unsecured PHI. The Notice identifies laboratory orders, results, and invoices as records that may contain PHI. Its permitted uses and disclosures concern treatment, payment, healthcare operations, and other

legally authorized purposes; they do not authorize access by an outside intruder.

31. By obtaining, collecting, and storing Plaintiffs' and Class Members' Private Information, Quest assumed legal and equitable duties and knew and should have known that they were thereafter responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized access.

32. Patients rely on Quest to protect the confidentiality of information furnished for laboratory services even when their healthcare providers transmit it on their behalf. A patient need not personally use Quanum LSM for Quest to maintain laboratory records associated with that patient.

## B. <u>The Quanum Lab Services Manager Platform</u>

33. Quanum Lab Services Manager (LSM) system is Quest's online platform that physicians, hospital personnel, and medical office staff use to manage laboratory services, order lab tests online, access test results, track order status, and order supplies.[3]

34. Because Quanum LSM permits healthcare professionals to retrieve patient test results, records accessible through the platform can reveal sensitive

---

[3] Bill Toulas, *Quest Diagnostics confirms data breach exposed patient records*, BleepingComputer (Oct. 23, 2026), https://www.bleepingcomputer.com/news/security/quest-diagnostics-confirms-data-breach-exposed-patient-records/; *see also Quanum Lab Services Manager*, Quest Diagnostics, https://www.questdiagnostics.com/healthcare-professionals/lab-tools-it-systems/quanum-lab-services-manager (last visited Nov. 4, 2026).

medical information associated with an identifiable patient. The particular records involved in this incident remain the subject of Quest's investigation.

### C. The Data Breach

35. In its Form 8-K dated October 22, 2026, Quest disclosed that it discovered unauthorized access to Quanum LSM the preceding day. Quest described the platform as a system certain clients use to place test orders and retrieve results, and stated that it believed an unauthorized party had accessed certain patient records.[4]

36. On October 22, 2026, Quest published an incident notice on its website. It reported that it had paused access to Quanum LSM and was investigating unauthorized access to that system.[5]

37. Quest's October 26, 2026 update (the "Updated Notice") states that it remediated the incident and restored Quanum LSM and systems paused as a precaution. Quest also states that its investigation into affected information continues.[6]

---

[4] Quest Diagnostics Incorporated, Current Report (Form 8-K), Item 8.01 (Oct. 22, 2026) (reporting discovery on Oct. 21, 2026), https://www.sec.gov/Archives/edgar/data/1022079/000094787126000941/ss6979200_8k.htm.

[5] *An update on an incident involving one of our systems*, Quest Diagnostics (Oct. 22, 2026), https://web.archive.org/web/20261023013143/https://www.questdiagnostics.com/links/quanum-notice.

[6] *An Update on an Incident Involving One of Our Systems*, Quest Diagnostics (Oct. 26, 2026), https://www.questdiagnostics.com/links/quanum-notice.

38. The Updated Notice and patient FAQs acknowledge that personal information and patient records were affected. Quest states that it is identifying affected patients and will notify them and describe available resources, including credit and identity monitoring. The notice does not identify the particular records accessed for each Plaintiff.

39. On information and belief, the affected records included identifying information associated with laboratory orders and results. This allegation is based on Quanum LSM's clinical ordering and results functions and Quest's acknowledgment that patient records were affected. Quest has not publicly identified every category of affected information.

40. The confidentiality of identifiable laboratory information has value independent of its potential use for financial fraud. An unauthorized person's access to test orders and results reveals private medical affairs that patients entrusted to Quest for limited purposes. Unlike a password or payment-card number, a patient's medical history cannot simply be replaced after disclosure.

41. On information and belief, deficiencies in the implementation or maintenance of safeguards governing access to Quanum LSM permitted the unauthorized access to patient records. The platform's access-control configuration, authentication procedures, activity logs, and incident investigation are within Quest's possession and will identify the precise deficiencies and means of entry.

42. The Updated Notice also warns patients to watch for phishing, voice phishing, and scams concerning breach notices, monitoring, or settlements. Those warnings underscore the potential for misuse of patient information.

43. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal personal information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes.

**D. <u>The Data Breach was Foreseeable</u>**

44. The Data Breach was entirely foreseeable and avoidable.

45. First, this Data Breach is not the only data breach Quest suffered in the past ten years. Considering its long history of publicly reported data security incidents involving patient information, Quest was, or should have been, well aware of the risks of unauthorized access and the need to implement stronger safeguards to protect sensitive patient data:

a. In December 2016, Quest reported a security breach involving its MyQuest by Care360 mobile application, which exposed the names, dates of birth, laboratory results, and in some cases, telephone numbers of approximately 34,000 individuals.[7]

b. In June 2019, Quest disclosed that AMCA, a third-party billing

---

[7] Mary McCue Bell, *Quest Diagnostics discloses cyber breach*, The Washington Times (Oct. 24, 2026), https://www.washingtontimes.com/news/2026/oct/24/quest-diagnostics-discloses-cyber-breach/.

collections provider, reported unauthorized access to a system containing information concerning approximately 11.9 million Quest patients. The reported information included financial, identifying, and medical information, but Quest stated that laboratory test results were not provided to AMCA. Litigation arising from that separate incident was centralized in this District. *See In re American Medical Collection Agency, Inc. Customer Data Security Breach Litigation*, No. 2:19-md-02904 (D.N.J.).[8]

c. In August 2021, Quest reported that its subsidiary, ReproSource Fertility Diagnostics, suffered a ransomware attack that potentially compromised the protected Private Information of approximately 350,000 patients.

46. These incidents put Quest on notice that unauthorized access to patient information was a foreseeable risk requiring sustained attention to security, including the safeguards protecting clinical platforms.

47. The healthcare sector is particularly susceptible to cyberattacks. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "'[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII).'"[9]

---

[8] Quest Diagnostics Inc., Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-Q) (Sept. 30, 2026), https://www.sec.gov/Archives/edgar/data/1022079/000102207926000108/dgx-20260930.htm.

[9] Jim Finkle, *FBI warns healthcare firms that they are targeted by hackers*, Reuters (Aug. 20, 2014), https://www.reuters.com/article/us-cybersecurityhealthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-

48. The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[10]

49. The sensitivity of laboratory information, the scale of Quest's operations, and the consequences of unauthorized access made reasonable security a necessary part of providing its services.

50. Despite its own history of security incidents and the well-reported risks of cyberattacks targeting sensitive patient information in the healthcare industry, Quest failed to implement adequate measures to safeguard Plaintiffs' and Class Members' Private Information.

**E. <u>Value of the Relevant Sensitive Information</u>**

51. At all relevant times, Quest was well aware that the Private Information it collects from Plaintiffs and Class Members is highly sensitive and of significant

---

hackersidUSKBN0GK24U20140820.

[10] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, Am. Med. Ass'n (Oct. 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals (emphasis omitted).

value to those who would use it for wrongful purposes.

52. Personal identifiers and medical information can be used together to impersonate patients, obtain additional information, or target them with convincing fraudulent communications.

53. Private Information is also a valuable commodity to cyber attackers. The U.S. Attorney General confirmed in 2020 that "hackers" target consumers' sensitive personal information because it "has economic value."[11] Indeed, a robust "cyber black market" exists in which cybercriminals openly post stolen payment card numbers, Social Security numbers, and other Private Information on several underground internet websites, commonly referred to as the "dark web."

54. Identity thieves can use identifying information for financial fraud and can use health-related information for medical identity theft. The risk depends on the particular information accessed and the circumstances of the disclosure.[12]

55. Medical identity theft can introduce another person's treatment information into a patient's records, create false claims, and interfere with care or insurance benefits. These are foreseeable consequences of misuse.[13]

---

[11] *Attorney General William P. Barr Announces Indictment of Four Members of China's Military for Hacking into Equifax*, U.S. Dep't of Justice (Feb. 10, 2020), https://www.justice.gov/archives/opa/speech/attorney-general-william-p-barr-announces-indictment-four-members-china-s-military.

[12] *What to Know About Identity Theft*, Fed. Trade Comm'n, https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited Nov. 4, 2026).

[13] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, KFF Health

56. The ramifications of Quest's failures to keep Plaintiffs' and Class Members' Private Information secure are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years, while fraudulent activity might not show up for six to twelve months or even longer.

57. Further, criminals often trade stolen Private Information on the "cyber black-market" for years following a breach. Cybercriminals can post stolen Private Information on the internet, thereby making such information publicly available.

58. The absence of an immediately detected fraudulent transaction does not establish that disclosed medical information remains confidential or cannot later be misused.

59. As a company operating in the health sector, Quest knew, or reasonably should have known, the importance of safeguarding Plaintiffs' and Class Members' Private Information entrusted to them, and of the foreseeable consequences if Quest's data security systems were breached. This includes the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach. Quest failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

---

News (Feb. 7, 2014), https://khn.org/news/rise-of-indentity-theft.

### F. FTC Data Security Guidance

60. The Federal Trade Commission ("FTC") has issued numerous guides for business highlighting the importance of reasonable data security practices, which should be factored into all business-related decision making.[14]

61. The Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. § 45, prohibits businesses like Quest from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.[15]

62. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[16]

---

[14] *Start with Security: A Guide for Business*, Fed. Trade Comm'n, https://www.ftc.gov/system/files/ftc_gov/pdf/920a_start_with_security_en_aug2023_508_final_0.pdf (last visited Nov. 4, 2026).

[15] See FTC v. Wyndham Worldwide Corp., 799 F.3d 236 (3d Cir. 2015) (addressing the FTC's authority to challenge unfair cybersecurity practices).

[16] *Protecting Personal Information: A Guide for Business*, Fed. Trade Comm'n (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

63. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[17] This is consistent with guidance provided by the FBI, HHS, and the principles set forth in the CISA 2020 guidance.

64. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[18]

65. On information and belief, Quest's implementation and maintenance of safeguards fell short of reasonable data-security practices reflected in this guidance.

---

[17] *Start with Security: A Guide for Business*, Fed. Trade Comm'n, https://www.ftc.gov/system/files/ftc_gov/pdf/920a_start_with_security_en_aug2023_508_final_0.pdf (last visited Nov. 4, 2026).

[18] *Privacy and Security Enforcement*, Fed. Trade Comm'n, https://www.ftc.gov/news-events/topics/protecting-consumer-privacy-security/privacy-security-enforcement (last visited Nov. 4, 2026).

66. Quest was or should have been aware of its obligations to protect the Private Information of Plaintiffs and Class Members because of its position as a business which collects and stores sensitive PII and PHI.

**G. <u>HIPAA Privacy and Security Requirements</u>**

67. HIPAA's implementing regulations provide standards directly relevant to safeguarding the patient information at issue.

68. Quest is a clinical laboratory and diagnostic information services company and, as a healthcare provider that transmits health information electronically, a covered entity under HIPAA, 45 C.F.R. § 160.103.

69. The HIPAA Security Rule requires covered entities to protect the confidentiality, integrity, and availability of electronic PHI and guard against reasonably anticipated threats and impermissible uses or disclosures. 45 C.F.R. § 164.306(a). It requires risk analysis, reasonable risk-management measures, review of system activity, and incident-response procedures. 45 C.F.R. § 164.308(a)(1)(ii)(A), (B), (D), and (a)(6). Technical safeguards include access controls, audit controls, and procedures to authenticate persons or entities seeking access. 45 C.F.R. § 164.312(a)(1), (b), and (d).

70. Under 45 C.F.R. § 164.402, an impermissible acquisition, access, use, or disclosure of PHI that compromises its security or privacy is presumptively a breach, subject to specified exceptions and the required risk assessment. These

regulations address the same interest implicated here: preventing unauthorized access to identifiable patients' health information.

71. Plaintiffs allege on information and belief that Quest failed to reasonably implement or maintain safeguards directed to that risk, permitting the unauthorized access described above.

### H. <u>Reasonable Security Practices</u>

72. Reasonable practices for a clinical platform include restricting access to authorized users, verifying user identity, reviewing access logs, assessing vulnerabilities, timely applying appropriate security updates, and training personnel responsible for protecting patient information. Safeguards must operate in practice, rather than exist only in written policies.

73. CISA's guidance likewise identifies software updates, protection against phishing, and maintained security software as measures relevant to reducing unauthorized-access risks.

74. The NIST Cybersecurity Framework 2.0 identifies outcomes for managing access, protecting data, monitoring systems, and responding to incidents.

75. On information and belief, Quest failed to reasonably implement or maintain safeguards appropriate to the risk of unauthorized access to Quanum LSM. Discovery will identify which controls were applicable, how they operated, and how any deficiencies contributed to the access to patient records.

## I. Quest's Duty to Protect Entrusted Patient Information

76. By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Quest assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure. Indeed, Quest acknowledges in its own HIPAA Notice of Privacy Practices that it "is required by law to maintain the privacy of [its patients'] PHI."[19]

77. In addition to its obligations under federal and state laws, Quest owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in Quest's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

78. Quest owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Plaintiffs and Class Members.

79. Quest owed a duty to Plaintiffs and Class Members to design, maintain, and test its computer systems, servers, and networks to ensure that the Private

[19] https://www.questdiagnostics.com/our-company/privacy/notice-of-privacy-practices.

Information was adequately secured and protected.

80. Quest owed a duty to implement reasonable practices governing access to the Private Information entrusted to it, including the access permitted to employees and other authorized users.

81. Quest owed a duty to employ reasonable monitoring and incident-response measures to detect and address unauthorized access in a timely manner.

82. Quest owed a duty to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

83. Quest owed a duty of care to Plaintiffs and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

84. Reasonable protection required safeguards appropriate to the sensitivity of the information and the risks to the system, including access restrictions, authentication, activity monitoring, and appropriate protection of stored and transmitted data.

85. On information and belief, Quest failed to take reasonable measures to protect the patient records accessible through Quanum LSM from unauthorized access.

86. On information and belief, Quest failed to reasonably implement or maintain the safeguards described above, permitting the unauthorized access to Plaintiffs' and Class Members' records. The failure to protect those records caused

the loss of their confidentiality.

### J. Impacts of the Data Breach on Victims

87. The unauthorized access alleged here concerns confidential patient records, rather than merely information already available to the public. Plaintiffs allege a loss of medical confidentiality and an ongoing risk that the affected information will be misused.

88. Disclosure of persistent personal identifiers and medical information can create risks that outlast the intrusion itself. Restoring a system does not necessarily recover information already accessed or prevent an unauthorized recipient from later using it.[20]

89. Previously acquired personal information can make phishing and impersonation more convincing. An attacker may use known identifiers to solicit additional sensitive information or credentials.

90. Identifying information can be used to open unauthorized accounts, submit false claims, or impersonate an individual. Plaintiffs seek relief for injuries attributable to this Data Breach.[21]

---

[20] Ari Lazarus, *How fast will identity thieves use stolen info?*, Military Consumer (May 24, 2017), https://www.militaryconsumer.gov/blog/how-fast-will-identity-thieves-use-stolen-info.

[21] *Facts + Statistics: Identity Theft and Cybercrime*, Ins. Info. Inst., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (last visited Nov. 4, 2026) (discussing *Javelin Strategy & Research's Report 2018 Identity Fraud: Fraud Enters a New Era of Complexity*); Christine DiGangi, *5*

91. Misuse may occur after a delay. The Government Accountability Office has explained that stolen information may be retained before use and may remain available for fraudulent use for years.[22]

92. Indeed, the FTC notes that victims of medical-related identity theft or fraud may discover that their identity has been compromised after they:

a. Receive a bill for medical services they did not receive;

b. Get contacted by a debt collector about medical debt they do not owe;

c. See medical collection notices on their credit report that they do not recognize;

d. Find erroneous listings of office visits or treatments on their explanation of benefits (EOB);

e. Receive information from their health plan that they have reached their limit on benefits; or

f. Be denied insurance because their medical records show a condition they do not have.[23]

93. The potential delay in detecting misuse makes the specific information accessed, the circumstances of the intrusion, and reasonable protective measures

---

*Ways an Identity Thief Can Use Your Social Security Number*, USA Today (Nov. 2, 2017), https://www.usatoday.com/story/money/personalfinance/2017/11/15/5-ways-identity-thief-can-use-your-social-security-number/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/.

[22] *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, at 29, U.S. Gov't Accountability Office (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

[23] Federal Trade Commission, What To Know About Medical Identity Theft, https://consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last visited Nov. 5, 2026).

relevant to evaluating each Plaintiff's risk and losses.

94. Plaintiffs allege that access to their confidential laboratory information creates a substantial risk of targeted deception and medical or other identity-related misuse. Their allegations concerning anticipated protective measures are distinct from their allegations of an already completed loss of confidentiality.

95. Plaintiffs seek recovery for reasonable mitigation losses caused by the unauthorized access to their information, to the extent established and recoverable under the governing law.

### K. Plaintiffs' Experiences

***Plaintiff Gwendolyn Anderson***

96. Plaintiff Gwendolyn Anderson received laboratory testing from Quest through her healthcare providers within the last two years. In connection with those services, her healthcare provider supplied Quest with her identifying and health information, and Quest generated laboratory records associated with her testing.

97. Upon information and belief, Quest obtained and continues to store and maintain Plaintiff Anderson's Private Information. Quest owes Plaintiff Anderson a legal duty and obligation to protect her Private Information from unauthorized access and disclosure.

98. Plaintiff Anderson greatly values privacy and is very careful about sharing sensitive PII and PHI. Plaintiff Anderson diligently protects her Private

Information and stores any documents containing Private Information in a safe and secure location. Plaintiff Anderson has never knowingly transmitted unencrypted sensitive Private Information over the internet or via any other unsecured source.

99. Plaintiff Anderson reasonably expected that Quest would maintain appropriate safeguards to protect her Private Information. Had Plaintiff Anderson known that Quest's security measures for Quanum LSM were inadequate, she would not have permitted her information to be shared with Quest.

100. On information and belief, Plaintiff Anderson's identifying information and confidential laboratory records were among the patient records accessed without authorization in the Data Breach. That allegation is based on her Quest testing, Quest's retention of associated laboratory records, Quanum LSM's ordering and results-access functions, and Quest's acknowledgment that patient records were affected. The precise records accessed will be identified through Quest's records and investigation.

101. As of the filing of this Complaint, Plaintiff Anderson has not received notice from Quest providing essential details concerning the Data Breach, including how it occurred and what information was compromised.

102. The alleged unauthorized access deprived Plaintiff Anderson of the confidentiality of medical information entrusted to Quest. She did not authorize an outside intruder to obtain that information. She also anticipates protective efforts in

response to the risk of misuse of the affected information.

103. Plaintiff Anderson has experienced two unauthorized credit card charges and received unwanted phone calls, text messages, and phishing communications following the Data Breach.

104. Plaintiff Anderson has suffered and continues to experience anxiety and distress over the compromise of her Private Information, particularly given the persistent risk that such information may be exploited for identity theft or medical identity theft. Plaintiff Anderson's fear, anxiety, and distress are further compounded by the fact that Quest still has not fully informed Plaintiff Anderson and other victims of the Data Breach of key details about the Data Breach's occurrence or the information accessed.

105. Plaintiff Anderson has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Quest's possession, is protected and safeguarded from future breaches.

***Plaintiff Dennis Canetty***

106. Plaintiff Dennis Canetty utilized Quest's services for laboratory testing through his healthcare providers at least twice within the past year, most recently in September 2026. As a condition of receiving those services, Plaintiff Canetty provided his Private Information to Quest through his healthcare provider.

107. Upon information and belief, Quest obtained and continues to store and

maintain Plaintiff Canetty's Private Information. Quest owes Plaintiff Canetty a legal duty and obligation to protect his Private Information from unauthorized access and disclosure.

108. Plaintiff Canetty greatly values privacy and is very careful about sharing sensitive PII and PHI. Plaintiff Canetty diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. Plaintiff Canetty has never knowingly transmitted unencrypted sensitive Private Information over the internet or via any other unsecured source.

109. Plaintiff Canetty reasonably expected that Quest would maintain appropriate safeguards to protect his Private Information. Had Plaintiff Canetty known that Quest's security measures for Quanum LSM were inadequate, he would not have permitted his information to be shared with Quest.

110. On information and belief, Plaintiff Canetty's identifying information and confidential laboratory records were among the patient records accessed without authorization in the Data Breach. That allegation is based on his repeated Quest testing, including testing in September 2026, Quest's retention of his associated records, Quanum LSM's ordering and results-access functions, and Quest's acknowledgment that patient records were affected. Quest's records and investigation will identify the particular records accessed.

111. As of the filing of this Complaint, Plaintiff Canetty has not received

notice from Quest providing essential details concerning the Data Breach, including how it occurred and what information was compromised.

112. The alleged unauthorized access deprived Plaintiff Canetty of the confidentiality of medical information entrusted to Quest. He did not authorize an outside intruder to obtain that information. He also anticipates protective efforts in response to the risk of misuse of the affected information.

113. Plaintiff Canetty has suffered and continues to experience anxiety and distress over the compromise of his Private Information, particularly given the persistent risk that such information may be exploited for identity theft or medical identity theft. Plaintiff Canetty's fear, anxiety, and distress are further compounded by the fact that Quest still has not fully informed Plaintiff Canetty and other victims of the Data Breach of key details about the Data Breach's occurrence or the information accessed.

114. Plaintiff Canetty has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Quest's possession, is protected and safeguarded from future breaches.

***Plaintiff Angelica Luna***

115. Plaintiff Angelica Luna received laboratory testing performed by Quest within the past two years. As a condition of receiving those services, Plaintiff Luna provided her Private Information directly to Quest.

116. Upon information and belief, Quest obtained and continues to store and maintain Plaintiff Luna's Private Information. Quest owes Plaintiff Luna a legal duty and obligation to protect her Private Information from unauthorized access and disclosure.

117. Plaintiff Luna greatly values privacy and is very careful about sharing sensitive PII and PHI. Plaintiff Luna diligently protects her Private Information and stores any documents containing Private Information in a safe and secure location. Plaintiff Luna has never knowingly transmitted unencrypted sensitive Private Information over the internet or via any other unsecured source.

118. Plaintiff Luna reasonably expected that Quest would maintain appropriate safeguards to protect her Private Information. Had Plaintiff Luna known that Quest's security measures for Quanum LSM were inadequate, she would not have permitted her information to be shared with Quest.

119. On information and belief, Plaintiff Luna's identifying information and confidential laboratory records were among the patient records accessed without authorization in the Data Breach. That allegation is based on her Quest testing within the past two years, Quest's retention of associated records, Quanum LSM's ordering and results-access functions, and Quest's acknowledgment that patient records were affected. Quest's records and investigation will identify the particular records accessed.

120. As of the filing of this Complaint, Plaintiff Luna has not received notice from Quest providing essential details concerning the Data Breach, including how it occurred and what information was compromised.

121. The alleged unauthorized access deprived Plaintiff Luna of the confidentiality of medical information entrusted to Quest. She did not authorize an outside intruder to obtain that information. She also anticipates protective efforts in response to the risk of misuse of the affected information.

122. Plaintiff Luna has suffered and continues to experience anxiety and distress over the compromise of her Private Information, particularly given the persistent risk that such information may be exploited for identity theft or medical identity theft. Plaintiff Luna's fear, anxiety, and distress are further compounded by the fact that Quest still has not fully informed Plaintiff Luna and other victims of the Data Breach of key details about the Data Breach's occurrence or the information accessed.

123. Plaintiff Luna has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Quest's possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

124. Pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), Plaintiffs seek certification of the following Nationwide Class and New York

Subclass (collectively, the "Class," and their members, "Class Members"):

**Nationwide Class**

> All natural persons residing in the United States whose Private Information was accessed or acquired by an unauthorized person through the Quanum LSM incident disclosed by Quest on October 22, 2026.

**New York Subclass**

> All members of the Nationwide Class who resided in New York when they obtained the Quest laboratory services in New York in connection with which the affected Private Information was collected or generated.

125. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, employees, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to its departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

126. Plaintiffs reserve the right to amend the above definitions in subsequent pleadings and motions for class certification.

127. Plaintiffs request appropriate subclasses under Rule 23(c)(5), including subclasses required by material differences in applicable state law or the information

affected. They will address the governing law and manageability of each claim at class certification.

128. The proposed classes are defined by objective criteria concerning residence, laboratory services, and unauthorized access to patient records. Quest's patient, ordering, access-log, and incident-investigation records can be used to identify affected individuals and determine membership.

129. Numerosity: On information and belief, the proposed Nationwide Class includes at least thousands of patients and is sufficiently numerous that joinder is impracticable. This allegation rests on Quest's nationwide operations, the clinical functions of Quanum LSM, and Quest's acknowledgment that patient records were affected. The exact number is within Quest's knowledge. Plaintiff Canetty will separately establish numerosity for the New York Subclass through records identifying affected New York patients and transactions.

130. Commonality and Predominance: There are numerous questions of law and fact common to Plaintiffs and Class members, which include, but are not limited to, the following:

a. Whether Quest owed Plaintiffs and Class Members a duty to implement and maintain reasonable security procedures and practices to protect their Private Information accessible through Quanum LSM;

b. Whether Quest has breached such duties owed to Plaintiffs and Class Members, and whether that breach of duties caused the Data Breach;

c. Whether Plaintiffs and Class Members' Private Information was

compromised in the Data Breach;

d. Whether Quest's data security systems for Quanum LSM prior to the Data Breach were reasonable and consistent with HIPAA, the FTC Act, and industry standards;

e. Whether Quest's disclosures regarding the Data Breach were timely and adequate;

f. Whether Quest reasonably investigated the scope of affected information and took appropriate measures to address the consequences of unauthorized access;

g. Whether Plaintiffs and Class Members are entitled to damages, restitution, and the measure thereof as a result of Quest's conduct; and

h. Whether Plaintiffs and Class Members are entitled to declaratory and injunctive relief.

131. Typicality: Plaintiffs allege the same source of injury as the Class: unauthorized access to confidential patient records resulting from deficient safeguards for Quanum LSM. Plaintiff Canetty also asserts the New York claim on behalf of the New York Subclass. Differences in recoverable damages do not change the common conduct challenged.

132. Adequacy: Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs have retained competent and capable attorneys with significant experience in complex and class action litigation, including data breach class actions. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests that are contrary to or that conflict with

those of the proposed Classes.

133. Superiority: Common adjudication will avoid repeated litigation concerning the same platform, incident, and security practices. Individual actions may be impracticable given the expense of investigating those matters relative to individual recoveries. Plaintiffs will use common evidence concerning Quest's systems and response, together with objective records identifying affected patients. Any material differences in state law or individual damages will be addressed through appropriate subclasses, trial procedures, or other case-management measures.

134. Injunctive and Declaratory Relief: A class action is appropriate under Federal Rule of Civil Procedure 23(b)(2) because Quest has acted or refused to act on grounds that apply generally to Class Members, so that final injunctive relief or corresponding declaratory relief is appropriate as to all Class Members.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
(On Behalf of Plaintiffs and Nationwide Class)

135. Plaintiffs reallege and reincorporate every factual allegation set forth in the preceding paragraphs as though fully set forth herein.

136. By accepting and maintaining confidential information for laboratory services, Quest owed Plaintiffs and Class Members a duty to exercise reasonable

care in securing the systems through which that information could be accessed. The duty included reasonable authentication, access restrictions, monitoring, and response to unauthorized activity.

137. Quest knew that the Private Information was private and confidential and should be protected as private and confidential and, thus, Quest owed a duty of care not to subject Plaintiffs and Class Members to an unreasonable risk of harm because they were foreseeable and probable victims of any inadequate security practices.

138. Quest knew, or should have known, of the risks inherent in collecting and storing Private Information, the vulnerabilities of its data security systems, and the importance of adequate security.

139. Quest knew, or should have known, that its Quanum LSM system did not adequately safeguard Plaintiffs' and Class Members' Private Information.

140. Only Quest was in the position to ensure that its systems and protocols were sufficient to protect the Private Information that Plaintiffs and Class Members had entrusted to it.

141. On information and belief, Quest breached that duty by failing to reasonably implement or maintain safeguards restricting unauthorized access to Quanum LSM and detecting such access. The precise failures will be established through its system configuration, activity logs, risk assessments, and investigation.

142. HIPAA's Privacy and Security Rules inform the standard of reasonable care for the electronic health information entrusted to Quest. The relevant safeguards include those described above and the protections required by 45 C.F.R. § 164.530(c). Plaintiffs invoke those standards in support of their state-law negligence claim, not as a private federal cause of action.

143. The FTC's guidance and enforcement of reasonable data-security practices further inform the care appropriate to sensitive information. Plaintiffs do not seek to enforce the FTC Act through a private claim.

144. Quest's duty to exercise reasonable care in handling confidential patient information arises independently of any contractual promise to provide secure laboratory services.

145. The foreseeable consequences of inadequate safeguards included unauthorized access to identifiable patient records and resulting loss of confidentiality. The risk was heightened by the sensitivity of medical information and the known targeting of healthcare systems.

146. Plaintiffs allege that Quest's failures caused the access to their records and the resulting privacy injury and emotional distress described above.

147. Quest also must provide any breach notices required by applicable law. HIPAA requires notice without unreasonable delay and, subject to applicable exceptions, no later than 60 calendar days after discovery. 45 C.F.R. § 164.404(b).

148. As of the filing of this Complaint, Plaintiffs have not received an individualized explanation identifying their affected information. The absence of that information leaves Plaintiffs uncertain about the scope of the exposure and the protective measures appropriate to their circumstances.

149. There is a close causal connection between Quest's failure to implement security measures to protect the Private Information of Plaintiffs and Class Members and the harm suffered, or risk of imminent harm suffered by Plaintiffs and Class Members.

150. But for Quest's breaches of duty, Plaintiffs' and Class Members' Private Information would not have been compromised, or the compromise would have been detected and stopped far sooner.

151. Plaintiffs' and Class Members' Private Information was accessed as the proximate result of Quest's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

152. As a direct and proximate result of Quest's alleged negligence, Plaintiffs suffered loss of the confidentiality and control of their medical information and the anxiety and distress described in their individual allegations. Plaintiffs also face the alleged risk of future misuse. They seek compensation for actual injuries and reasonable mitigation losses attributable to the Data Breach to the extent

recoverable under applicable law.

153. Plaintiffs and Class Members seek compensatory and consequential damages for injuries caused by Quest's negligence and recoverable under the governing law, in amounts to be established through discovery and at trial, without duplicate recovery.

154. Additionally, as a direct and proximate result of Quest's negligence, Plaintiffs and Class Members have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Quest's possession and are subject to further unauthorized disclosures so long as Quest fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession, and Plaintiffs and Class Members are therefore also entitled to injunctive relief as set forth below.

## COUNT II
## BREACH OF IMPLIED CONTRACT
(On Behalf of Plaintiffs and Nationwide Class)

155. Plaintiffs reallege and reincorporate every factual allegation set forth in the preceding paragraphs as though fully set forth herein.

156. Plaintiffs and Class Members requested or authorized Quest's laboratory testing, directly or through their healthcare providers, and supplied the identifying and health information needed for that testing. Quest accepted that information, performed laboratory services, and generated and retained associated

records.

157. Through that course of dealing, the parties manifested an agreement that Quest would use reasonable safeguards to maintain the confidentiality of information entrusted for testing and related authorized purposes.

158. Confidential handling of patient information was part of the laboratory services Quest undertook to provide, consistent with its stated privacy practices. Plaintiffs did not supply their information for unrestricted disclosure or access by unauthorized outsiders.

159. The implied agreement required reasonable protection of the entrusted information. It did not require Plaintiffs to personally operate Quanum LSM; the agreement arose from their laboratory-service transactions with Quest.

160. Plaintiffs furnished the information necessary for the requested services, and Quest accepted and used it in performing those services. This conduct, together with the parties' expectations concerning confidential medical records, supports the alleged mutual undertaking.

161. Plaintiffs and Class Members fully performed their obligations under the implied contracts with Quest.

162. On information and belief, Quest breached that undertaking by failing to reasonably safeguard the records accessible through Quanum LSM, permitting the unauthorized access to Plaintiffs' and Class Members' information alleged

above.

163. The breach deprived Plaintiffs and Class Members of confidential handling of the medical information entrusted as part of their laboratory services. They seek recoverable contract damages, including proven consequential losses and nominal damages where permitted, without duplicate recovery.

**COUNT III**
**BREACH OF CONFIDENCE**
(On Behalf of Plaintiffs and Nationwide Class)

164. Plaintiffs reallege and reincorporate every factual allegation set forth in the preceding paragraphs as though fully set forth herein.

165. During Plaintiffs' and Class Members' interactions with Quest, Quest was fully aware of the confidential nature of the Private Information that Plaintiffs and Class Members provided to it.

166. The diagnostic relationship required Plaintiffs and Class Members to entrust Quest with identifying and health information for testing, reporting results, and related authorized purposes. Quest knew that the information concerned private medical affairs and accepted it in confidence.

167. Plaintiffs and Class Members did not authorize disclosure of that information to an outside intruder. Their authorization for laboratory services did not permit access unrelated to those services or another lawful purpose.

168. Quest undertook to preserve the confidentiality of the entrusted

information through reasonable safeguards against unauthorized access and disclosure.

169. On information and belief, Quest failed to maintain those safeguards and thereby permitted the unauthorized access to confidential records described above, contrary to the confidence in which the information was entrusted.

170. The alleged unauthorized access breached the confidentiality of the records and caused the privacy injuries and related distress described in Plaintiffs' individual allegations.

171. That loss of confidentiality was a foreseeable consequence of failing to reasonably protect identifiable medical records. Plaintiffs seek relief for the breach of their confidence, without duplicating recovery under their other claims.

172. As a direct and proximate cause of Quest's actions and/or omissions, Plaintiffs and Class Members have suffered damages, as alleged herein.

## COUNT IV
## UNJUST ENRICHMENT
(On Behalf of Plaintiffs and Nationwide Class)

173. Plaintiffs incorporate the preceding factual allegations. This claim is pleaded in the alternative under Rule 8(d), to the extent no enforceable contract governs the subject matter or affords an adequate contractual remedy for the benefit retained.

174. Quest received the benefits of Plaintiffs' and Class Members'

laboratory-service transactions, including payments made directly or on their behalf and the information necessary to perform and bill for those services.

175. Prior to and at the time Plaintiffs and Class Members entrusted their Private Information to Quest, Quest caused Plaintiffs and Class Members to reasonably believe that it would keep such Private Information secure through its Notice of Privacy Practices and Privacy Statement.

176. Plaintiffs and Class Members conferred those benefits in the course of obtaining laboratory services with the reasonable expectation that Quest would maintain reasonable safeguards for their confidential information.

177. On information and belief, Quest's revenues from laboratory services supported its operations, including data security. Plaintiffs allege that Quest accepted the benefits of transactions requiring confidential handling of patient information while failing to provide reasonable safeguards.

178. To the extent no enforceable contract governs that subject matter, it would be inequitable for Quest to retain the portion of those benefits attributable to safeguards it failed to provide, as established by the evidence.

179. Plaintiffs seek restitution measured by the benefit unjustly retained at their expense, accounting for the laboratory services actually provided, rather than an automatic refund of every payment made to Quest.

180. Plaintiffs request restitution or other appropriate equitable relief to the

extent permitted by applicable law and not duplicative of recovery on their other claims.

**COUNT V**
**BREACH OF FIDUCIARY DUTY**
(On Behalf of Plaintiffs and Nationwide Class)

181. Plaintiffs reallege and reincorporate every factual allegation set forth in the preceding paragraphs as though fully set forth herein.

182. Quest accepted sensitive patient information in the course of providing diagnostic services. Plaintiffs and Class Members entrusted it with confidential records that they could not secure within Quest's systems themselves. Plaintiffs allege that, to the extent recognized under applicable law, this relationship imposed fiduciary obligations concerning the handling and protection of those records.

183. The asserted duty is limited to safeguarding the confidential patient information entrusted to Quest and using or disclosing it only for authorized purposes.

184. On information and belief, Quest breached that duty by failing to reasonably implement or maintain safeguards preventing unauthorized access to the entrusted records.

185. The alleged breach caused the loss of confidentiality and related injuries described above. Plaintiffs seek damages recoverable under the governing law, without duplicate recovery.

## COUNT VI
## DECLARATORY AND INJUNCTIVE RELIEF
(On Behalf of Plaintiffs and Nationwide Class)

186. Plaintiffs reallege and reincorporate every factual allegation set forth in the preceding paragraphs as though fully set forth herein.

187. Plaintiffs seek declaratory relief under 28 U.S.C. §§ 2201–2202 and appropriate injunctive relief as remedies for the underlying substantive claims. The Declaratory Judgment Act does not supply an independent substantive cause of action or basis for federal jurisdiction.

188. On information and belief, Quest continues to retain Plaintiffs' and Class Members' records. Quest states that it remediated the incident and restored its systems, while its investigation into affected information continues. Plaintiffs seek relief addressing any continuing security deficiencies established by the evidence and reasonable measures to mitigate the consequences of the unauthorized access. Restoration of system access does not itself restore the confidentiality of information already disclosed.

189. Plaintiffs seek a judgment pursuant to this Court's authority under the Declaratory Judgment Act declaring, among other things, the following:

a. Quest owes a legal duty to secure the Private Information of Plaintiffs and Class Members and to timely notify them of any breach;

b. Quest must use reasonable safeguards for retained Private Information and provide notices required by applicable law; and

c. Plaintiffs and Class Members are entitled to appropriate relief for any proven breach of those obligations.

190. To the extent Plaintiffs establish a continuing or imminent threat of injury that prospective relief would redress, they seek an injunction tailored to the deficiencies established in this action, including appropriate requirements that Quest:

a. obtain an independent security assessment of the affected platform and remediate identified deficiencies;

b. maintain appropriate authentication, access restrictions, logging, and incident-response procedures;

c. periodically test relevant systems for vulnerabilities and apply appropriate remediation; and

d. train relevant personnel and provide affected patients with information and reasonable protective resources appropriate to the information compromised.

191. Unauthorized access to confidential medical information cannot be fully undone by a damages award. Plaintiffs seek prospective relief only to the extent necessary to prevent a continuing or imminent injury and to supplement any remedy at law that is inadequate to address that injury.

192. The requested relief would require reasonable safeguards proportionate to the sensitivity of the retained information and the deficiencies established, rather than measures unrelated to this incident.

193. Protecting confidential patient information and reducing the risk of

further unauthorized access serve the interests of affected patients and the public.

**COUNT VII**
**NEW YORK GENERAL BUSINESS LAW**
**N.Y. Gen. Bus. Law § 349, *et seq.***
(On Behalf of Plaintiff Dennis Canetty and the New York Subclass)

194. Plaintiff Dennis Canetty ("Plaintiff" for this Count), individually and on behalf of the New York Subclass, incorporates the preceding factual allegations and asserts a claim for deceptive acts or practices under N.Y. General Business Law § 349(h).

195. Quest's provision of laboratory services and its public representations concerning confidential handling of patient information were directed to consumers generally. Plaintiff alleges that Quest's privacy representations and omissions concerning its safeguards were materially misleading in connection with those services.

a. Quest represented through its Notice of Privacy Practices that it would protect patient health information and follow its stated privacy practices. On information and belief, its actual safeguards for the affected records did not reasonably implement those representations.

b. Plaintiff alleges that Quest omitted material information about the inadequacy of safeguards governing access to the patient records, information within Quest's knowledge and not reasonably available to patients.

196. Plaintiff alleges that he obtained the relevant Quest laboratory services in New York, directly or through his healthcare providers there, and that the transactions giving rise to this claim occurred in New York.

197. Reasonable consumers obtaining laboratory testing would regard the protection of identifiable medical information as material to the services. Quest's alleged representations and omissions were likely to mislead consumers concerning how their records would be protected.

198. Plaintiff alleges that the misleading assurances and omissions caused him and New York Subclass members to entrust information to Quest in transactions that exposed their records to the deficient safeguards alleged here. He would not have entrusted his information on the same terms had the inadequacy of those safeguards been disclosed.

199. As a result, Plaintiff alleges loss of the confidentiality of his medical information and the related injuries described in his individual allegations. He seeks actual damages to the extent recoverable under § 349(h), together with the statutory relief available upon proof of injury caused by the deception.

200. Quest's deceptive and unlawful acts and practices complained of herein affected the public interest and consumers at large, including New Yorkers affected by the Data Breach.

201. Plaintiff and the New York Subclass seek relief authorized by § 349(h), including actual damages or fifty dollars, whichever is greater, and injunctive relief where warranted. If a knowing or willful violation is established, they seek an increase in damages within the limits prescribed by § 349(h), together with

reasonable attorneys' fees and any recoverable costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment as follows:

A. Certifying the appropriate Class and Subclass under Rule 23, appointing Plaintiffs as representatives of the classes they may properly represent, and appointing their counsel under Rule 23(g);

B. Awarding compensatory and consequential damages and, where authorized and supported, statutory, nominal, exemplary, or punitive damages;

C. Awarding restitution or other equitable monetary relief where permitted, without duplicate recovery;

D. Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

E. Awarding injunctive relief as is necessary to protect the interests of Plaintiffs and Class Members;

F. Awarding attorneys' fees and costs, as allowed by law;

G. Awarding pre- and post-judgment interest, as provided by law;

H. Granting such further relief as the Court deems just and proper; and

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

**LITE DEPALMA GREENBERG & AFANADOR, LLC**

Dated: November 9, 2026

*/s/ Joseph J. DePalma*

Joseph J. DePalma
Catherine B. Derenze
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
jdepalma@litedepalma.com
cderenze@litedepalma.com

**DICELLO LEVITT LLP**
Amy E. Keller*
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel.: (312) 214-7900
akeller@dicellolevitt.com

*Attorneys for Plaintiffs and the Proposed Class and Subclass*

* *pro hac vice forthcoming*

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is related to the below matters:

- *Maliaka Johnson, Tom Mesmer, and Steven Schwarz v. Quest Diagnostics Incorporated*, Civil Action No. 2:26-cv-13795 (D.N.J.), filed 10/22/2026
- *Giga Romero v. Quest Diagnostics Incorporated*, Civil Action No. 2:26-cv-13837 (D.N.J.), filed 10/23/2026
- *Ann OBrien v. Quest Diagnostics Incorporated, d/b/a Quest Diagnostics Clinical Laboratories Inc.*, Civil Action No. 2:26-cv-13847 (D.N.J.), filed 10/23/2026
- *Eunice Garcia Ayala v. Quest Diagnostics Incorporated*, Civil Action No. 2:26-cv-13852 (D.N.J.), filed 10/23/2026
- *Akellia Briggs v. Quest Diagnostics Incorporated*, Civil Action No. 2:26-cv-13864 (D.N.J.), filed 10/23/2026
- *Lisa Williamson v. Quest Diagnostics Incorporated*, Civil Action No. 2:26-cv-13889 (D.N.J.), filed 10/24/2026
- *Catherine Vasey v. Quest Diagnostics Incorporated*, Civil Action No. 2:26-cv-13820 (D.N.J.), filed 10/23/2026
- *Beatriz Barcelo Boyker v. Quest Diagnostics Incorporated*, Civil Action No. 2:26-cv-13822 (D.N.J.), filed 10/23/2026
- *Lana Luciano v. Quest Diagnostics Incorporated*, Civil Action No. 2:26-cv-13827 (D.N.J.), filed 10/23/2026
- *David Umeda v. Quest Diagnostics Incorporated*, Civil Action No. 2:26-cv-13866 (D.N.J.), filed 10/23/2026
- *Samuel Bishop v. Quest Diagnostics Incorporated*, Civil Action No. 2:26-cv-13874 (D.N.J.), filed 10/23/2026
- *Donald Kisselbach v. Quest Diagnostics Incorporated*, Civil Action No. 2:26-cv-13911 (D.N.J.), filed 10/26/2026
- *Sue Colby v. Quest Diagnostics Incorporated*, Civil Action No. 2:26-cv-13913 (D.N.J.), filed 10/26/2026
- *Joseph Jen v. Quest Diagnostics Incorporated*, Civil Action No. 2:26-cv-13923 (D.N.J.), filed 10/26/2026
- *Howard Rogers and Paul J. Leonard v. Quest Diagnostics Incorporated*, Civil Action No. 1:26-cv-13930 (D.N.J.), filed 10/26/2026
- *Debby Worley v. Quest Diagnostics Incorporated*, Civil Action No. 1:26-cv-13940 (D.N.J.), filed 10/26/2026

- *J.G. v. Quest Diagnostics Incorporated*, Civil Action No. 2:26-cv-13971 (D.N.J.), filed 10/26/2026
- *D.G. v. Quest Diagnostics Incorporated*, Civil Action No. 2:26-cv-13972 (D.N.J.), filed 10/26/2026
- *Steven Jeffrey Howitt v. Quest Diagnostics Incorporated*, Civil Action No. 2:26-cv-14031 (D.N.J.), filed 10/27/2026
- *Brian Williams v. Quest Diagnostics Incorporated*, Civil Action No. 2:26-cv-14032 (D.N.J.), filed 10/27/2026
- *James Velasquez v. Quest Diagnostics Incorporated*, Civil Action No. 2:26-cv-14037 (D.N.J.), filed 10/27/2026
- *Mohamad A. Tlaib v. Quest Diagnostics Incorporated*, Civil Action No. 2:26-cv14049 (D.N.J.), filed 10/28/2026
- *McCabe v. Quest Diagnostics Incorporated*, Civil Action No. 2:26-cv-14071 (D.N.J.), filed 10/28/2026
- *Donald Cobean v. Quest Diagnostics Incorporated*, Civil Action No. 2:26-cv-14080 (D.N.J.), filed 10/28/2026
- *Robert Cooke v. Quest Diagnostic Incorporated*, Civil Action No. 2:26-cv-14163 (D.N.J.), filed 10/30/2026
- *Steven Prescott v. Quest Diagnostics Incorporated*, Civil Action No. 2:26-cv-14213 (D.N.J.), filed 10/30/2026
- *Misty Marler V. Quest Diagnostics Incorporated*, Civil Action No. 2:26-cv-14254 (D.N.J.), filed 11/2/2026
- *Louis Cato v. Quest Diagnostics Incorporated*, Civil Action No. 2:26cv14380 (D.N.J.), filed 11/5/2026

**LITE DEPALMA GREENBERG & AFANADOR, LLC**

Dated: November 9, 2026

*/s/ Joseph J. DePalma*

Joseph J. DePalma
Catherine B. Derenze
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
jdepalma@litedepalma.com
cderenze@litedepalma.com

**DICELLO LEVITT LLP**
Amy E. Keller*
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel.: (312) 214-7900
akeller@dicellolevitt.com

*Attorneys for Plaintiffs and the Proposed Class and Subclass*

* *pro hac vice forthcoming*